NOT FOR PUBLICATION

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| | : | |
| **ELITE ORTHOPEDIC & SPORTS** | : | |
| **MEDICINE PA,** | : | |
| | : | **Civil Action No. 14-6932 (ES) (MAH)** |
| **Plaintiff,** | : | |
| | : | **OPINION** |
| v. | : | |
| | : | |
| **NORTHERN NEW JERSEY** | : | |
| **TEAMSTERS BENEFIT PLAN,** | : | |
| | : | |
| **Defendant.** | : | |
| | : | |

**SALAS, DISTRICT JUDGE**

This action arises out of Defendant Northern New Jersey Teamsters Benefit Plan's (the "NNJ Plan") refusal to pay Plaintiff Elite Orthopedics & Sports Medicine P.A. ("Elite") for emergency surgical services rendered to Juanita Rivera, a participant of the Plan. The NNJ Plan moved for summary judgment pursuant to Federal Rule of Civil Procedure 56. (D.E. No. 24). Having considered the parties' submissions in support of and in opposition to the instant motion, the Court decides the matter without oral argument. *See* Fed. R. Civ. P. 78(b). For the reasons set forth below, the Court GRANTS the NNJ Plan's motion for summary judgment.

## I.    BACKGROUND[1]

***The NNJ Plan.*** The NNJ Plan is a self-insured multiemployer "employee benefit plan," as defined in 29 U.S.C. § 1002(3) and § 1002(37)(A)(i), and is the result of collective bargaining between several unions and employers. (D.E. No. 27, Defendant's Statement of Material Facts

---

[1]    The Court distills these facts from the parties' statements of material facts and exhibits accompanying the parties' submissions. Unless otherwise noted, these background facts are undisputed. Additional facts are provided elsewhere in this Opinion as relevant to the Court's analysis.

Not in Dispute ("SMF") ¶ 1).  The NNJ Plan is maintained pursuant to an Agreement and Declaration of Trust ("Trust Agreement") and is administered by a Board of Trustees comprising representatives of the unions and contributing employers.  (*Id.* ¶¶ 1-2).

*Trustees.*  The Board of Trustees ("Trustees") is the "plan sponsor" and "plan administrator" as defined by Employee Retirement Income Security Act of 1974 ("ERISA").  (*Id.*); 29 U.S.C. § 1002(16).  The NNJ Plan offers several different benefit levels for hospitalization, medical, and other benefits.  (SMF ¶ 4).  The specific benefit plan under which a participant is covered is based upon the contributions negotiated in the participant's employer's collective bargaining agreement.  (*Id.*).  Under the Trust Agreement, the Trustees are responsible for determining the form, nature, and amount of benefits to be provided by the NNJ Plan.  (*Id.* ¶ 8). Specifically, the Trust Agreement (i) vests the Trustees with the power to interpret, apply, and construe the terms the Trust Agreement; and (ii) renders the Trustees' interpretation, application, or construction of the terms binding on the unions, employers, and employees.  (*Id.*).

*Elite.*  Elite is a medical services provider.  (*Id.* ¶ 7).  On October 24, 2013, Jason Schneidkraut, M.D., a surgeon employed by Elite, performed emergency surgery on Ms. Rivera to ameliorate complications caused by a break in a steel rod that had previously been implanted in her femur.  (*Id.* ¶ 15; D.E. No. 29, Fahimi Affidavit ¶ 4).  Ms. Rivera, a "Plan N" level participant, subsequently executed an assignment of benefits assigning the right to payment of benefits to Elite for services rendered.  (SMF ¶¶ 7, 15).

*Plan N Description.*  The Plan N Summary Plan Description ("Description") (i) provides the Trustees with further authority to interpret and construe the terms of the benefit plans and the Trust Agreement; and (ii) notes that "[a]ny determination made by the Board of Trustees with respect to a Participant's rights or benefits will be entitled to the maximum deference permitted by

law and will be final and binding upon all Participants and beneficiaries." (*Id.* ¶ 9). Moreover, the "ERISA and Appeal Rights" section of the Plan N Description details the Trustees' discretion:

> The Trustees shall, subject to the requirements of law, be the sole judges of the standard of proof required in any case and the application and interpretation of this Plan and any other Plan documents and to decide all matters arising in connection with the operation or administration of the Plan. Without limiting the generality of the foregoing, the Trustees shall have the sole and absolute discretionary authority to: take all actions and make all decisions with respect to the eligibility for and the amount of benefits under the Plan; formulate, interpret and apply rules, regulations and policies necessary to administer the Plan in accordance with its terms; decide questions, including legal and factual questions, relating to the payment of benefits under the Plan; resolve and/or clarify any ambiguities, inconsistencies and omissions arising under the Plan or other Plan documents; and to process and approve or deny benefit claims and rule on any benefit exclusions. The decision upon review of the Board of Trustees or its designated committee shall be given deference in all courts of law to the greatest extent allowed by applicable law.

(*Id.* ¶ 10).

Generally, a participant's benefits are limited to those set forth in the plan documents for the applicable plan of benefits, and the Plan N level of benefits is no exception. (*Id.* ¶ 11). Notably, the Plan N Description states, "IMPORTANT! NETWORK ONLY COVERAGE. THIS PLAN COVERS SERVICES FOR NETWORK PROVIDERS. THIS MEANS THAT THERE IS NO COVERAGE FOR DOCTORS, LABORATORIES, OR GENERALLY, OTHER PROVIDERS THAT ARE NOT IN THE NETWORK." (D.E. No. 25-1 at 7).

At all times relevant to this action, the NNJ Plan utilized Horizon Blue Cross Blue Shield of New Jersey ("Horizon") as its Preferred Provider Organization for facilities and medical providers. (SMF ¶ 13). The Plan N Description defines "Preferred Provider Organization" as a "group of selected physicians, specialists, Hospitals and other treatment centers which have agreed to provide their services to Plan Participants and beneficiaries at a negotiated rate under the terms of an agreement." (*Id.* ¶ 12). Such providers are referred to as "Network providers." (*Id.*).

Conversely, medical providers not under contract "to provide services at negotiated rates" are considered "Out-of-Network" by the Plan N Description. (*Id.*). Here, the parties agree that Elite was an "Out-of-Network" provider under the Plan N Description. (*Id.* ¶ 14; D.E. No. 32, Plaintiff's Reply to Defendant's Statement of Material Facts ("RSMF") ¶ 14).

**Summary of Allegations.** Although Elite admits that Dr. Schneidkraut was an Out-of-Network provider, it alleges (namely, by including in its Complaint hospital authorization number "#132960658") that it is entitled to relief because the NNJ Plan preauthorized Dr. Schneidkraut's services. (D.E. No. 1-1, ("Compl.") ¶ 3). Elite further argues that it would not have performed the surgery "but for said representation." (*Id.* ¶ 5). The NNJ Plan, however, contends that the authorization Elite allegedly relied on was provided by Horizon, "not the NNJ Plan, and was provided with respect to the hospital charges, not to the surgeon's charges." (D.E. No. 26, ("Def. Mov. Br.") at 22). Generally, Horizon provides preauthorization only for inpatient confinement— not for procedures performed during the stay. (SMF ¶ 25). Further, the NNJ Plan does not demand preauthorization for surgery, but where such preauthorization is sought, only the NNJ Plan could grant it. (*Id.*). Finally, Horizon admitted that it provided the preauthorization for the hospital stay. (*Id.* ¶ 26).

**Procedural History.** In response to the NNJ Plan's denial of coverage for the surgery Dr. Schneidkraut performed on Ms. Rivera, Elite appealed to the Board of Trustees. (SMF ¶ 18). The Trustees found that because Elite was an Out-of-Network provider and because the Plan N level of benefits did not provide coverage for Out-of-Network providers (even in emergency situations), the NNJ Plan properly denied Elite's claims. (*Id.*). By appealing to the Board of Trustees, Elite exhausted its administrative remedies available through the NNJ Plan with respect to the surgery Dr. Schneidkraut performed on Ms. Rivera. (*Id.* ¶ 19).

Accordingly, on September 18, 2014, Elite initiated this lawsuit in the Superior Court of New Jersey, Bergen County. (D.E. No. 1-1 at 3). The NNJ Plan removed the case to federal court (D.E. No. 1) and moved for summary judgment (D.E. No. 24). Elite opposed the NNJ Plan's motion. (D.E. No. 29, ("Pl. Opp. Br.") at 35-38). And on September 26, 2016, the NNJ Plan replied to Elite's opposition. (D.E. No. 30, ("Def. Reply Br.")). Due to an error, the Court instructed Elite to resubmit its response to the NNJ Plan's statement of material facts (D.E. No. 31), which it refiled on March 3, 2017 (D.E. No. 32). The matter is now ripe for resolution.

## II.    LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).[2] A "genuine" issue of material fact exists for trial "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The movant bears the initial burden of establishing that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the non-moving party bears the burden of proof at trial, the moving party may discharge its burden by showing "that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. If the movant meets this burden, the non-movant must then set forth specific facts that demonstrate the existence of a genuine issue for trial. *Id.* at 324; *Azur v. Chase Bank, USA, Nat'l Ass'n*, 601 F.3d 212, 216 (3d Cir. 2010).

---

[2]    Unless otherwise indicated, all internal citations and quotation marks are omitted, and all emphasis is added.

Conversely, where the moving party bears the burden of proof at trial, it "must show that it has produced enough evidence to support the findings of fact necessary to win." *El v. Se. Pa. Transp. Auth. (SEPTA)*, 479 F.3d 232, 237 (3d Cir. 2007). "Put another way, it is inappropriate to grant summary judgment in favor of a moving party who bears the burden of proof at trial unless a reasonable juror would be compelled to find its way on the facts needed to rule in its favor on the law." *Id.* at 238.

Notably, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. But the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also Swain v. City of Vineland*, 457 F. App'x 107, 109 (3d Cir. 2012) (stating that the non-moving party must support its claim "by more than a mere scintilla of evidence").

## III. DISCUSSION

### A. ERISA Preempts Elite's State Law Claims

Elite alleges that the NNJ Plan preauthorized Ms. Rivera's emergency surgery, "promised to pay" for the cost of the surgery, and subsequently failed to pay for Dr. Schneidkraut's services. (Compl. ¶ 3). Elite also alleges that it would not have performed the surgery "but for" the NNJ Plan's representation that it would pay for the procedure. (*Id.* ¶¶ 4-5). It is unclear from Elite's Complaint, however, whether it relies on state or federal law. (*See generally id.*). To the extent Elite's claims rely upon state law, they are preempted by ERISA and must be dismissed.

Generally, state law causes of action that relate to employee benefit plans are preempted by ERISA. *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 138 (1990). Congress inserted a provision in ERISA stating that the law "supersede[s] any and all State laws insofar as they may

now or hereafter relate to any employee benefit plan." 29 U.S.C. § 1144(a). The breadth of ERISA's preemption provision applies to "all [State] laws, decisions, rules, regulations, or other State action having the effect of law." *Id.* § 1144(c)(1). As the Supreme Court observed in *Ingersoll-Rand*, ERISA's preemption clause is "deliberately expansive" in order to "establish pension plan regulation as exclusively a federal concern." 498 U.S. at 138; *see also Khan v. Guardian Life Ins. Co. of Am.*, No. 16-0253, 2016 WL 1574611, at *2 (D.N.J. Apr. 19, 2016) (noting that the clause "has been interpreted broadly in light of the legislative purpose in establishing ERISA as the exclusive means of obtaining a legal remedy related to an employee benefit plan."). Further, the Court noted that a state law "relates to" an employee benefit plan even if it is not "specifically designed to affect such plans, or the effect is only indirect." *Ingersoll-Rand*, 498 U.S. at 139.

ERISA states that a civil action may be brought "by a participant or beneficiary . . . to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). Because state law actions are largely preempted by ERISA, such civil actions generally must be brought in federal court. For example, state breach-of-contract claims against an ERISA plan stemming from a denial of benefits are preempted. *See Ford v. UNUM Life Ins. Co. of Am.*, 351 F. App'x 703, 706 (3d Cir. 2009) (noting that state law claims such as "breach of contract, negligence, and intentional infliction of emotional distress" are preempted if they "relate to an ERISA-governed benefits plan"). For the foregoing reasons, to the extent that Elite's claims rely on state law, they are preempted by ERISA.

### B. The Board of Trustees' Decision Was Neither Arbitrary Nor Capricious

***Standard of Review.*** The Supreme Court has held that where a benefit plan confers discretion upon an administrator to construe or interpret the language in the plan, such interpretation and construction warrants judicial deference unless it constitutes an abuse of discretion. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 111, 115 (1989). And in the Third Circuit, "[w]hen a plan grants its administrator such discretionary authority, trust principles make a deferential standard of review appropriate . . . and we review a denial of benefits under an arbitrary and capricious standard." *Fleisher v. Standard Ins. Co.*, 679 F.3d 116, 120-21 (3d Cir. 2012); *see also McLeod v. Hartford Life & Accident Ins. Co.*, 372 F.3d 618, 623 (3d Cir. 2004) (applying the arbitrary and capricious standard where the plan document provided the administrator with "full discretion and authority to determine eligibility for benefits and to construe and interpret all terms of the Plan"). In reviewing denial-of-coverage claims, courts treat the abuse of discretion standard as synonymous with the arbitrary and capricious standard. *Hunter v. Federal Express Corp.*, 169 F. App'x 697, 703 (3d Cir. 2006).

Here, the Plan N Description vests the Board of Trustees with "sole authority and discretion to interpret and construe the terms of this Plan . . . including provisions establishing eligibility for benefits . . . as well as all other matters." (SMF ¶ 9). The Plan N Description also notes that "[a]ny determination made by the Board of Trustees with respect to a Participant's rights or benefits will be entitled to the maximum deference permitted by law and will be final and binding upon all Participants and beneficiaries." (*Id.*). Similarly, the "ERISA and Appeal Rights" section of the Plan N Description grants the Trustees "absolute discretionary authority to . . . decide questions, including legal and factual questions, relating to the payment of benefits under the Plan." (*Id.* ¶ 10). Because these provisions within the Plan N Description unequivocally grant the Trustees

discretionary authority, the Court finds that the arbitrary and capricious standard governs the Trustees' decision.

**Analysis.**   Generally, "[a]n administrator's decision is arbitrary and capricious if it is without reason, unsupported by substantial evidence or erroneous as a matter of law." *Fleisher*, 679 F.3d at 121.  Conversely, "[a]n administrator's interpretation is not arbitrary if it is reasonably consistent with unambiguous plan language." *Id.*  Further, a trustee's interpretation "should be upheld even if the court disagrees with it, so long as the interpretation is rationally related to a valid plan purpose and not contrary to the plain language of the plan." *Pokol v. E.I. du Pont de Nemours & Co.*, 963 F. Supp. 1361, 1370 (D.N.J. 1997); *see also Foley v. Int'l Bhd. of Elec. Workers Local Union 98 Pension Fund*, 271 F.3d 551, 555 (3d Cir. 2001) (noting that the district court "was bound to affirm [the administrator's] decision if it was not contrary to the Plan's terms and was rationally related to a legitimate Plan purpose"); *Orvosh v. Program of Grp. Ins. for Salaried Emp. of Volkswagen of Am*, 222 F.3d 123, 129 (3d Cir. 2000) (stating that "a plan administrator's decision will be overturned only if it is clearly not supported by the evidence in the record or the administrator has failed to comply with the procedures required by the plan").

In determining whether an administrator's interpretation of a plan is reasonable, the Third Circuit has employed a "series of helpful factors":

> (1) whether the interpretation is consistent with the goals of the Plan; (2) whether it renders any language in the Plan meaningless or internally inconsistent; (3) whether it conflicts with the substantive or procedural requirements of the ERISA statute; (4) whether the [relevant entities have] interpreted the provision at issue consistently; and (5) whether the interpretation is contrary to the clear language of the Plan.

*Moench v. Robertson*, 62 F.3d 553, 566 (3d Cir. 1995).  No single *Moench* factor is dispositive; rather, a reviewing court must examine the *Moench* factors holistically in making a determination. *McCall v. Metro. Life Ins.*, 956 F. Supp. 1172, 1182 (D.N.J. 1996).

Here, the NNJ Plan contends that the Trustees' denial of Elite's claims "reflected their position that the intent of the language in the Plan N [Description] was to completely exclude coverage for treatment or services rendered by non-network providers." (Def. Mov. Br. at 18). Further, it asserts that this interpretation was not unreasonable, irrational, or contrary to any of the Plan N language. (*Id.*). Specifically, the NNJ Plan points to the language in the Plan N Description stating that Plan N provides "NETWORK ONLY COVERAGE" and that "THIS PLAN COVERS SERVICES FOR NETWORK PROVIDERS. THIS MEANS THAT THERE IS NO COVERAGE FOR DOCTORS, LABORATORIES, OR GENERALLY, OTHER PROVIDERS THAT ARE NOT IN THE NETWORK." (*Id.* at 17). The NNJ Plan also references the Plan N Description's express statement that "Major Medical benefits are provided through Network providers only." (*Id.*). Relying on both of these provisions, the NNJ Plan concludes that the Trustees' interpretation of the Plan N documents—that no Out-of-Network coverage is provided—comports precisely with Plan N language. (*Id.* at 18).

Elite, on the other hand, contends that the Trustees' determination is arbitrary and capricious. (Pl. Opp. Br. at 36). Elite argues that the NNJ Plan has already recognized that its prior policy was unfair when it subsequently amended Plan N to cover emergency Out-of-Network surgical services. (*Id.* at 35-36). Elite then notes that New Jersey state law requires "[c]overage for out of service area medical Care when medically necessary for urgent or emergency conditions where the member cannot reasonably access[] in network services." (*Id.* at 36). Relying on this provision, Elite alleges that "a body of law makers has recognized that [the NNJ Plan's] policy is unfair and creates a hardship." (*Id.*). Elite next argues that although the NNJ Plan defines "medically necessary" and "physician," these definitions do not foreclose payments to Out-of-Network providers. (*Id.* at 36-37). Consequently, Elite concludes that "care of the patient is

foremost regardless of whether" the provider is Out-of-Network.  (*Id.* at 37).  Finally, Elite argues

that the NNJ Plan's refusal to pay is arbitrary and capricious because it paid Elite for non-

emergency surgery performed by Dr. Schneidkraut in June, July, and August of 2015.  (*Id.*).

Contrary to Elite's assertions, this Court is satisfied that the Trustees' interpretation is

supported by substantial evidence, rationally related to the NNJ Plan's purpose, and not contrary

to NNJ Plan's plain language.  The Court notes that the plain language of the Plan N Description

adequately indicates the NNJ Plan's intent to cover predominantly in-network services, providing

only limited and explicit exceptions for Out-of-Network coverage.  In the opening pages of the

Plan N Description, the NNJ Plan expressly states that no coverage is provided for doctors,

laboratories, or other providers that are Out-of-Network.  (SMF ¶ 11).  Similarly, the NNJ Plan

language also states that major medical benefits will only be provided through network providers.

(*Id.* ¶ 24).  Notably, however, the Plan N Description also explicitly states that Out-of-Network

coverage is provided for hospitals, but requires 25% co-insurance from the participant.  (D.E. No.

25-1 at 7).  The Court holds that the Trustees' finding that the NNJ Plan properly denied Elite's

claim is consistent with the unequivocal language employed by the Plan N Description, stating

that coverage for Out-of-Network doctors (like Dr. Schneidkraut) is not provided.

Moreover, the Trustees' interpretation satisfies the *Moench* factors.  As to the first factor

(and as the NNJ Plan aptly notes), the Trustees' interpretation of the Plan N Description is

consistent with the goals of the NNJ Plan to provide hospitalization, major medical, dental, optical,

and other benefits to participants while preserving NNJ Plan resources for participants and

dependents who are entitled to benefits under the terms of the NNJ Plan.  (Def. Mov. Br. at 20);

*see also Pers. Pool of Ocean Cty., Inc. v. Trs. of Heavy & Gen. Laborers' Welfare Fund*, 899 F.

Supp. 1362, 1372-73 (D.N.J. 1995) (holding that the first factor was met where the "goals of the

Plan are to provide those benefits permitted by the Plan in accordance with its provisions" where the explicit language of that plan provided only limited benefits for the type of expense at issue). Similarly, the second factor is met because the Trustees' interpretation of the Plan N Description does not render any language in the NNJ Plan meaningless or internally inconsistent. To the contrary, the interpretation animates the precise language of the Plan N Description.

As to the third factor (and as the NNJ Plan again notes), the Trustees' interpretation does not conflict with any of the substantive or procedural requirements of ERISA because there is no substantive requirement under ERISA that would mandate the coverage Elite seeks. (Def. Mov. Br. at 20); *see also Davidson v. Wal-Mart Assocs. Health & Welfare Plan*, 305 F. Supp. 2d 1059, 1087 (S.D. Iowa 2004) (third factor satisfied because "ERISA does not create a substantive entitlement to [health] benefits . . . [t]he level of benefits to be provided is within the control of the private parties creating the plan . . . [and] ERISA does not prohibit exclusions in plan benefits where the exclusion has a legitimate business purpose").

As to the fourth factor, Elite makes no showing that the NNJ Plan has interpreted the type of exclusion at issue inconsistently.[3] (*See generally* Pl. Opp. Br.). Further, in their denial, the Trustees noted that Plan N does not reimburse doctors, laboratories, or other providers that are Out-of-Network. (D.E. No. 25-3 at 4). Finally, as to the fifth factor (and as this Court has already noted), the interpretation is not contrary to the NNJ Plan language; rather, the interpretation comports with NNJ Plan language requiring the exclusion of coverage for claims involving Out-of-Network doctors and providers. (*See* D.E. No. 25-1 at 7).

---

[3] "The non-moving party . . . must point to actual evidence in the record on which a jury could decide an issue of fact its way." *El v. Se. Pa. Transp. Auth.*, 479 F.3d 232, 238 (3d Cir. 2007); *see also Berckeley Inv. Grp. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006) ("[S]ummary judgment is essentially 'put up or shut up' time for the non-moving party: the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument.").

Elite asserts that the New Jersey legislature has condemned insurance plans (like Plan N at all times relevant to this action) that do not provide coverage for urgent Out-of-Network medical care. (Pl. Opp. Br. at 36). But as the NNJ Plan notes (and Elite concedes), ERISA largely preempts state law. (Def. Mov. Br. at 9-12; Def. Reply Br. at 2; Pl. Opp. Br. at 36). Consequently, Elite's reliance on the New Jersey legislature's opinions concerning such insurance plans is inapposite. Next, Elite argues that the Plan N Description suggests that the care of the patient is foremost regardless of whether the provider is Out-of-Network. (Pl. Opp. Br. at 37). Elite draws this conclusion based on the Plan N Description's failure to note, in defining "physician" and "medically necessary," that Out-of-Network payments will not be made. (*Id.* at 36-37). Generally, "[a]lthough the specific usually controls the general in contract construction, we are to construe a contract as a whole." *In re Cendant Corp. Sec. Litig.*, 454 F.3d 235, 246 (3d Cir. 2006). Elite's argument wholly ignores the clarity with which the Plan N Description, in its opening papers, states in capital letters that coverage is not provided by the NNJ Plan for Out-of-Network doctors, laboratories, or other providers (with an exception for Out-of-Network hospitals). (D.E. No. 25-1 at 7).

Elite also argues that the NNJ Plan's refusal to pay for Dr. Schneidkraut's services is arbitrary and capricious because the NNJ Plan paid for his services in June, July, and August of 2015 for non-emergency surgery. (Pl. Opp. Br. at 37). Elite, however, overlooks the fact that, as of December 1, 2014, Ms. Rivera was moved from the Plan N level of benefits (which did not provide any benefits for Out-of-Network providers) to the Plan 10 level of benefits (which did provide Out-of-Network benefits). (Def. Reply Br. at 4).[4] Because the Court finds—and Elite

---

[4]    Elite also cites case law demonstrating that an administrator's failure to notify employees of certain severance provisions and subsequent failure to pay benefits was deemed arbitrary and capricious. (Pl. Opp. Br. at 37). Elite goes on to argue that Horizon, as an agent of the NNJ Plan, failed to notify St. Joseph's Hospital. (*Id.*). Despite these

fails to show otherwise—that the NNJ Plan's refusal to provide coverage for Dr. Schneidkraut's services was rationally related to Plan N's purpose to provide coverage only for in-network doctors and that the Trustees' interpretation meets the *Moench* factors, the Court concludes that the Trustees' decision is neither arbitrary nor capricious.

### C. Elite Has Abandoned Its Misrepresentation Claim

Elite alleges that it relied on the NNJ Plan's representation in performing the surgery and that it "would not have performed the surgery but for" the NNJ Plan's representation that it "pre-certified and authorized Plaintiff ELITE to perform emergency surgery on JUANITA RIVERA." (Compl. ¶¶ 3-5). Elite references a "hospital authorization number" of "#132960658" as evidence of the NNJ Plan's preauthorization. (*Id.* ¶ 3).

While Elite makes much of the NNJ Plan's alleged representation, it fails to explicitly set out a misrepresentation claim as one of its counts. Further, the NNJ Plan contends that Elite cannot establish a claim for misrepresentation in this case largely because the alleged authorization number Elite relied on was provided by Horizon with respect to "the hospital charges, not to the surgeon's charges." (Def. Mov. Br. at 22). The NNJ Plan also notes that it "does not require that providers receive preauthorization for surgery," but where such authorization is requested, "it would only be given by the NNJ Plan, not Horizon." (*Id.* at 23).

The Court finds that Elite has abandoned any alleged misrepresentation claim because it failed to address this claim in its opposition to the NNJ Plan's motion for summary judgment. *See Bray v. Schlumberger Tech. Corp.*, No. 10-4428, 2012 WL 1941855 (D.N.J. May 29, 2012) (concluding that plaintiff abandoned and waived her disparate-impact and aiding-and-abetting claims where she failed to respond to defendant's arguments relating to those claims in her

contentions, however, Elite fails to allege precisely what Horizon failed to notify St. Joseph's Hospital about and does not offer any proof that Horizon was an agent of the NNJ Plan. (*See* Def. Reply Br. at 4-5).

response to defendant's summary judgment motion); *Werner v. Warrell Corp.*, No. 09-1444, 2012 WL 2979034, at *9 (M.D. Pa. Feb. 17, 2012) (finding that plaintiff abandoned her retaliation claims where she failed to address defendant's arguments with respect to those claims in her response to defendant's motion for summary judgment).

To be sure, even if Elite had not abandoned its misrepresentation claim, the Court agrees with the NNJ Plan that Elite has failed to establish such a claim. To establish a claim under ERISA for equitable estoppel, a plaintiff "must establish (1) a material representation, (2) reasonable and detrimental reliance upon the representation, and (3) extraordinary circumstances." *Curcio v. John Hancock Mut. Life Ins.*, 33 F.3d 226, 235 (3d Cir. 1994). "[A] misrepresentation is material if there is a substantial likelihood that it would mislead a reasonable employee in making an adequately informed decision." *Fischer v. Phila. Elec. Co.*, 994 F.2d 130, 135 (3d Cir. 1993). As to the second prong, a plaintiff must show "reasonableness and injury." *Curcio*, 33 F.3d at 237. For the third prong, a plaintiff must make "a showing of affirmative acts of fraud, establishing a network of misrepresentations that arises over an extended course of dealing between parties, or based on the vulnerability of particular plaintiffs." *Lees v. Munich Reinsurance Am., Inc.*, No. 14-2532, 2016 WL 164611, at *4 (D.N.J. Jan. 13, 2016) (citing *Kurz v. Phila. Elec. Co.*, 96 F.3d 1544, 1553 (3d Cir. 1996)). This Circuit "has declined to find extraordinary circumstances where there was an oral misrepresentation to beneficiaries, but no showing of repeated misrepresentations over time." *Id.* at *4. Conversely, the Third Circuit "has found extraordinary circumstances existed where there were repeated oral and written misrepresentations coupled with plaintiff[']s diligence in trying to determine his benefits." *Id.*

Here, Elite alleges that it relied on a representation made by the NNJ Plan in performing the surgery on Ms. Rivera. (Compl. ¶¶ 3-5). But Elite cannot show that the NNJ Plan made a

material representation because the only representation made to Elite was by Horizon, not the NNJ

Plan.  (Def. Mov. Br. at 22-23).  Similarly, because Horizon (not the NNJ Plan) provided Elite

with an authorization number, Elite cannot argue that it reasonably relied on a representation by

the NNJ Plan in performing the surgery.  (*See id.*).  Finally, Elite cannot show the existence of

extraordinary circumstances because there were no repeated oral or written misrepresentations

made to it; rather, as the NNJ Plan notes, there was *no* representation made to Elite that coverage

would be provided for the surgery.  (*Id.*).  Because Elite has abandoned—and nevertheless cannot

establish—a claim for misrepresentation, summary judgment is granted in favor of the NNJ Plan

on this issue.

### D.  Elite Failed to Exhaust its Administrative Remedies

In its Complaint, Elite seeks payment of $61,220.00 in benefits.  (Compl. ¶ 7).  The charges

sought by Dr. Schneidkraut on October 24, 2013, for Ms. Rivera's surgery, however, totaled

$30,014.00.  Aside from payment for the surgery, Elite seeks payment for services rendered by

John F. Ambrose, M.D., on October 24, 2013, and Dr. Schneidkraut on October 22, 2013.  (Def.

Mov. Br. at 26-27).

Under § 502(a)(1)(B) of ERISA, a civil action may be brought to recover benefits due

under the terms of one's plan.  29 U.S.C. § 1132 (a)(1)(B).  However, "a federal court will not

entertain an ERISA claim unless the plaintiff has exhausted the remedies available under the plan."

*Harrow v. Prudential Ins. Co. of Am.*, 279 F.3d 244, 249 (3d Cir. 2002).  Specifically, courts

require:

> exhaustion of administrative remedies to help reduce the number of
> frivolous lawsuits under ERISA; to promote the consistent treatment of
> claims for benefits; to provide a nonadversarial method of claims
> settlement; and to minimize the costs of claims settlement for all concerned.
> Moreover, trustees of an ERISA plan are granted broad fiduciary rights and
> responsibilities under ERISA . . . and implementation of the exhaustion

requirement will enhance their ability to expertly and efficiently manage their funds by preventing premature judicial intervention in their decision-making processes.

*Id.* at 249.

Here, the Plan N Description provides an administrative remedy in the form of an appeal: when the NNJ Plan denies a participant's claim for benefits, the participant may appeal the NNJ Plan's determination within 180 days of receiving the notice of denial. (SMF ¶ 27). If a participant exhausts the appeals process and wishes "to file a lawsuit challenging the final determination, [the participant] must do so within 12 months of the date of the final notice of denial." (*Id.*). Although Elite appealed the denial of benefits for the surgical services rendered by Dr. Schneidkraut on October 24, 2013, it did not appeal the denial of benefits for services by Dr. Ambrose and Dr. Schneidkraut on October 24, 2013 and October 22, 2013, respectively. (*Id.*). Elite makes a bald assertion in its response to the NNJ Plan's Statement of Material Facts that it appealed those decisions, but has furnished no evidence consistent with this allegation.[5] (D.E. No. 32 ¶ 28). Therefore, Elite has failed to exhaust the NNJ Plan's administrative remedies, as required by ERISA, and any claims based on these services must be denied. Furthermore, like with its misrepresentation claim, Elite did not respond to any of the NNJ Plan's arguments addressing these claims in its opposition to the NNJ Plan's motion for summary judgment. Accordingly, Elite's claim for payment of services rendered by Dr. Ambrose on October 24, 2013, and Dr. Schneidkraut on October 22, 2013, are deemed abandoned.

---

[5] Pursuant to Local Civil Rule 56.1, the non-moving party must "furnish . . . a responsive statement of material facts, addressing each paragraph of the movant's statement, indicating agreement or disagreement and, if not agreed, stating each material fact in dispute and citing to the affidavits and other documents submitted in connection with the motion." A party's failure to appropriately dispute stated facts with record evidence constitutes an acceptance of the other party's facts as undisputed. *McCann v. Unum Provident*, 921 F. Supp. 2d 353, 359 (D.N.J. 2013); *see also El*, 479 F.3d at 238 ("The non-moving party cannot rest on mere pleadings or allegations; rather it must point to actual evidence in the record on which a jury could decide an issue of fact its way.").

## IV.     CONCLUSION

For the reasons set forth above, the Court GRANTS the NNJ Plan's motion for summary judgment.  An appropriate order accompanies this Opinion.

_s/ Esther Salas_____
**Esther Salas, U.S.D.J.**
